UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FRANK MAZZOCCHI,

                         Plaintiff,

         -against-

WINDSOR OWNERS CORP., TUDOR REALTY
SERVICES, CORP., U.F.H. APARTMENTS INC.,
ISAAC STERN, VIVIENNE GILBERT, MAUREEN
DUNPHY, SCOTT NAGLE, JAMES TAYLOR, PAUL
MATTEN, JIN HAN, NANCY BARSOTTI, MICHAEL
GEORGE INC., FLOWERSCHOOL NEW YORK INC.,
FERRUH BECERIKLISOY, and NORBERTO
HERNANDEZ, individually and in their corporate
capacity,

                         Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _8/31/2016_

11 Civ. 7913 (AT)

**MEMORANDUM
AND ORDER**

ANALISA TORRES, District Judge:

Plaintiff, Frank Mazzocchi, brings this action on behalf of himself and his long-term

girlfriend, Jane Doe, alleging that Defendants discriminated against Mazzocchi and Doe because

of Doe's disability in violation of Section 3604(f)(2) of the Fair Housing Act and 42 U.S.C. §

1985(3).  Defendants move to strike an expert report pursuant to Federal Rule of Evidence 702.

Defendants also seek summary judgment pursuant to Federal Rule of Civil Procedure 56.  For

the reasons stated below, the motion to strike is GRANTED, and the motion for summary

judgment is GRANTED in part and DENIED in part.

## BACKGROUND

I.    The Parties

In 1977, Frank Mazzocchi leased Unit 821 (the "Apartment") in the building located at 5

Tudor City Place (the "Building") in Manhattan.  Decl. of Frank Mazzocchi ("Pl. Decl.") ¶ 4,

ECF No. 162-32.  The Building was converted into a residential co-op, and in 1987, Mazzocchi

bought the Apartment and entered into a proprietary lease with Defendant Windsor Owners

Corp. ("Windsor"), the cooperative corporation that owns the Building.  Defs.' Rule 56.1

Statement of Material Facts ("Defs. 56.1") ¶¶ 1-3, ECF No. 146; Pl. Decl. ¶ 5.  Defendant Tudor

Realty Services Corp. ("Tudor") serves as managing agent for Windsor, Aff. of Drew Moschella

¶ 37, ECF No. 143, and Defendants Nancy Barsotti, Maureen Dunphy, Vivienne Gilbert, Paul

Matten, and James Taylor were members of Windsor's board of directors (the "Board") during

the relevant time period, Tr. of Board Meeting on May 4, 2011 ("May 4 Tr.") 1, Moschella Aff.,

Ex. D, ECF No. 143-4.[1]

     Mazzocchi's relationship with Jane Doe began by phone in 1991, when Doe lived in

California.  Dep. of Frank Mazzocchi ("Pl. Dep.") 43-44, ECF No. 141-9.  They spoke "[a]

dozen, two dozen times."  *Id.* 44.  Mazzocchi then booked a flight for Doe and met her in person

for the first time at Newark Airport.  *Id.* 43, 45.  On August 26, 1991, Doe moved into the

Apartment with Mazzocchi, and the couple lived there together until 2010, aside from 18 months

when they lived in Brooklyn between 1994 and 1996.[2]  Pl. Decl. ¶¶ 6-8, 71.  Although

Mazzocchi and Doe are not married, Def. 56.1 ¶ 10, Mazzocchi states that he has "maintained a

close relationship with Doe" since 1991 and "consider[s] Doe [his] common law wife and ha[s]

treated her as such,"[3] Pl. Decl. ¶¶ 2-3.  Mazzocchi is Doe's "sole means of support."  Pl. Rule

---

[1] On September 17, 2013, the Court dismissed Mazzocchi's claims against U.F.H. Apartments Inc., Isaac Stern, Scott Nagle, Jin Han, Michael George Inc., Flowerschool New York Inc., Ferruh Beceriklisoy, and Norberto Hernandez.  *Mazzocchi v. Windsor Owners Corp.* ("*Mazzocchi II*"), No. 11 Civ. 7913, 2013 WL 5295089 (S.D.N.Y. Sept. 17, 2013).

[2] Defendants contend that Mazzocchi had moved out of the Apartment by 1997.  *See* Aff. of Norberto Hernandez ¶¶ 10-11, ECF No. 142 ("[T]owards the end of 1997, Mr. Mazzocchi moved out and did not stay over at the Building on a regular basis. . . . In fact, Mr. Mazzocchi has not lived at the Building at all since at least 2010.").  Viewing the record in the light most favorable to the non-moving party, the Court accepts for the purposes of summary judgment that Mazzocchi lived in the Apartment until 2010.

[3] A number of residents and employees of Windsor Tower understood Doe and Mazzocchi to be in a relationship, including the Building's superintendent, *see* Dep. of Noberto Hernandez 58-59, ECF No. 162-12 ("I thought they were boyfriend and girlfriend"); *see also* Dep. of Drew Moschella 56-57, ECF No. 162-18 ("[Doe] told one of my employees, a porter on duty I guess at that time, that [Mazzocchi] was her boyfriend."), and at least one member of the Board, *see* Dep. of Vivienne Gilbert 79, ECF No. 162-9 ("The gossip was that Mr. Mazzocchi was [Doe's]

56.1 Counterstatement of Material Facts ("Pl. 56.1") ¶ 10, ECF No. 167.  The couple has

maintained a joint bank account since 2003, Pl. Decl. ¶ 9, and Mazzocchi pays all of Doe's living

expenses, provides Doe with an allowance, and does not charge Doe for living at the Apartment,

Pl. 56.1 ¶ 10.  Doe and Mazzocchi celebrate the anniversary of their relationship, spend holidays

and birthdays together, and exchange greeting cards and flowers.  Pl. Decl. ¶¶ 12-13, 15.  Doe

has spent time with Mazzocchi's family, Pl. Dep. 67-68, 78, and the couple raised two dogs that

Mazzocchi "consider[s] . . . to be [their] children," Pl. Decl. ¶ 19.  In 2003, Mazzocchi named

Doe the executor of his will, left her his entire estate, and designated her as his healthcare proxy.

Pl. Dep. 68-70.  Mazzocchi also arranged for the couple to be buried in the same burial plot.  Pl.

Decl. ¶ 10.

II.   Jane Doe's Mental Health

Mazzocchi contends that Doe suffers from symptoms of mental illness that first became

evident to him in 1991.  *See* Pl. Decl. ¶¶ 21, 24-26.  When Doe arrived in New York that year,

she told Mazzocchi that she had been fired from a waitressing job because she could not record

customers' orders, and that she had been let go from a position at a hospice because she told the

patients that they would get better.  *Id.* ¶¶ 25-26.  Subsequently, Mazzocchi "personally observed

Doe behaving in ways which demonstrate[] she is not able to work, think clearly, or take care of

herself."  *Id.* ¶ 24.  Doe could not, for example, perform basic arithmetic, had difficulty retaining

information, and "barely can write [and] scribbles like a six-year-old kid in kindergarten."  Pl.

Dep. 220-21; *accord* Pl Decl. ¶¶ 24-27.  Nor could Doe write a check, use a computer, prepare a

budget, or count change.  Pl. Decl. ¶¶ 28-29.

According to Mazzocchi, Doe's mental health began to deteriorate in 2006, which

---

boyfriend [and] allowed her to live in his apartment."); *see also* Dep. of Maureen Dunphy 88, ECF No. 162-5 ("Mr.
Mazzocchi is her family.").

Mazzocchi attributes to "Tudor and Windsor's curtailment of activities which Doe had been engaging in for years." *Id.* ¶¶ 34-35. Mazzocchi contends that Tudor and Windsor's actions were motivated by a desire to improve the Building's image, and that Norberto Hernandez, the Building's superintendent, told him in 2006 that the Windsor Board now had "powerful people" who planned to "bring about big changes" and "clean up the image of the building." Pl. Decl. ¶ 68. Specifically, Mazzocchi states that Building staff asked Doe to stop feeding pigeons and squirrels on the sidewalk in front of the Building and in a nearby park—activities which were "central to [Doe's] daily routine" "[b]ecause Doe did not work." *Id.* ¶ 35. Mazzocchi also states that Doe was told to stop sunbathing on the sidewalk with the couple's dog and visiting with elderly people in the lobby or in front of the Building. *Id.* Thereafter, Doe's "delusional beliefs increased," *id.* ¶ 34; *see also id.* ¶ 30 ("Doe ha[s] told me that she will be kept safe by her only friends, God, Jesus and the Holy Spirit, . . . [that] God is going to provide her with a condominium in California[,] [and] that she is a prophet."); *id.* ¶ 32 ("Doe believes she is capable of completing impossible goals, like becoming a boxer, after we saw the movie, 'Million Dollar Baby.'"); *id.* ¶ 33 ("On occasion[], Doe believes she is 15 years old and acts that way."), and she began having increasingly frequent fits of anger, during which she would curse and scream, *id.* ¶ 34. In 2007, Doe became reluctant to go outside, frequently thought she was being followed, and believed that her telephone and apartment had been bugged with a listening device. *Id.* ¶ 42. Doe sometimes went for days without sleeping and had "violent nightmares" in which she had "bouts with the devil." *Id.* ¶ 43. She also began painting "religious symbols" on the walls of the Apartment and covered the windows with black paint to block out sunlight. *Id.* ¶ 37.

In their deposition testimony, Building staff, residents, and Board members corroborated some aspects of Mazzocchi's account of Doe's conduct. Doe was occasionally observed yelling

or screaming at passersby—sometimes using profane language, making nonsensical statements, or issuing threats. *See, e.g.*, Dep. of Norberto Hernandez 61-62, 74-75, ECF No. 162-12 (recounting that Doe told him, "I'm a prophet; I'm Jesus; F you," and that Doe "yelled at [him], cursed at [him] and . . . said her name was God" when he addressed her as Jane Doe); Dep. of Scott Nagle 34-35, ECF No. 162-26 ("Her behavior changed. . . . She was more combative, more moody, more aggressive."); Dep. of James Taylor 26, ECF No. 162-29 ("[Her interactions with others] were typically abusive. . . . Whenever she walked through the lobby she would yell at the doormen. She would call them names. She would insult them. She would threaten them. . . . You know she would say 'F you' . . . intimidating things like I'm going to get you or . . . that type of thing."); Dep. of Drew Moschella 53, ECF No. 162-18 ("Well, she would threaten people and say I'll get you . . . . She used a lot of profane words."). Building staff, residents, and Board members also observed Doe in front of the Building sunbathing with her dog, dancing while listening to music on her headphones, and feeding pigeons. *See, e.g.*, Hernandez Dep. 62; Moschella Dep. 52; Gilbert Dep. 146.

On January 1, 2009, Building staff contacted Mazzocchi and asked him to come to the Building immediately because "there was a problem with Doe." Pl. Decl. ¶ 45. Upon arriving at the Apartment, Mazzocchi found Doe "speaking incoherently in a bathroom full of steam." *Id.* ¶ 46. The Apartment's windows were open, and a bed comforter and clock that Mazzocchi had bought for Doe were lying on the ground below outside the Building. *Id.* ¶ 47. A team of emergency medical technicians arrived at the Apartment, and one EMT told Mazzocchi that Doe was "dissociated." *Id.* ¶ 48. Doe was then transported to Bellevue Hospital, involuntarily confined, and placed in Bellevue's Comprehensive Psychiatric Emergency Program unit, where

she remained for approximately a month. *Id.* ¶ 49.[4] On January 2 and 5, 2009, Mazzocchi spoke

with a Bellevue psychiatrist, Marianne Chai, MD, who informed him that Doe had been

diagnosed with bipolar disorder. *Id.* ¶ 50. Mazzocchi also learned through conversations with

Bellevue staff that Doe had been medicated with Risperdal and Depakote during her hospital

stay. *Id.* ¶ 52. Mazzocchi saw Doe's prescriptions for those drugs, which were given to Doe

upon her release from Bellevue, and Mazzocchi filled and renewed the prescriptions at a

pharmacy in February and March 2009. *Id.* ¶ 52. Thereafter, Doe stopped taking the

medication, told Mazzocchi that "there is nothing wrong [with] her," and accused Mazzocchi "of

trying to label her bipolar." *Id.* ¶ 53.

In 2010, Mazzocchi moved out of the Apartment, in part due to "friction in [Doe and

Mazzocchi's] relationship" caused by Mazzocchi's efforts to encourage Doe to seek psychiatric

help and her refusal to do so.[5] Pl. 56.1 ¶ 10; Pl. Decl. ¶¶ 16-17, 53-54. Nonetheless, in addition

to speaking with Doe regularly on the phone, Pl. Decl. ¶ 11, Mazzocchi visits Windsor Tower

"almost every weekend" to see Doe, *id.* ¶ 18, though "sometimes [Doe] will not come out" of the

Apartment to see Mazzocchi, Pl. Dep. 59. Mazzocchi also continues to support Doe financially,

and he states that he continues to love Doe and "maintains a close, loving relationship with her"

despite the difficulties caused by her mental illness. Pl. 56.1 ¶ 10; Pl. Decl. ¶¶ 20-21.

III.   Windsor's Efforts to Remove Doe from the Apartment

A.  Letters Sent to Mazzocchi Regarding Doe's Conduct

---

[4] Mazzocchi provides copies of a letter dated March 11, 2009 from the New York City Fire Department requesting payment for "Emergency Ambulance Service Care" provided on January 2, 2009 from "05 Tudor City Pl #821" to "Bellevue Hospital," Decl. of Rick Ostrove, Ex. 7, ECF No. 162-35 at 40; a letter from Bellevue Hospital to Doe reflecting an outstanding "hospital bill" and an "Admission Date" of January 3, 2009, Ostrove Decl., Ex. 6, ECF No. 162-35 at 37; and an invoice dated March 13, 2009 from the New York City Health and Hospitals Corporation reflecting a charge for "CPEP PSYCHOTHER OP" services provided to Doe on February 12, 2009, Ostrove Decl., Ex. 5, ECF No. 162-35 at 34.

[5] Mazzocchi also attributes the "friction" in their relationship to Windsor's "efforts to remove Doe from the [B]uilding" and his decision to "air[] her illness in the courts," as discussed *infra*. Pl. Decl. ¶¶ 16, 71.

6

In 2003, when Hernandez began working as the Building's superintendent, he received "sporadic" complaints about Doe's conduct.  Aff. of Norberto Hernandez ¶ 15, ECF No. 142. Hernandez states that Doe would feed pigeons on the sidewalk in front of the Building; dance on the sidewalk "as if she were doing a strip tease performance"; "sometimes act in a loud, threatening and inappropriate manner"; and "often shout inside the hallways and lobby, using profanities and insulting others."  *Id.* ¶¶ 16-18.

The number of complaints increased in 2006, and Hernandez reported the complaints to Tudor, which began sending written notifications about Doe's conduct to Mazzocchi at his address in Brooklyn.[6]  *Id.* ¶ 23.  Specifically, in letters dated October 2006, January 2008, October 2009, and March 2010, respectively, Tudor notified Mazzocchi that Doe had been "feeding pigeons in front of the building at 5 Tudor City Place," Moschella Aff., Ex. B at 1, ECF No. 143-2; "loitering in the lobby, speaking abusively and profanely to the building's residents and staff," Moschella Aff., Ex. C at 1, ECF No. 143-3; "causing a disturbance in the building" and "verbally accost[ing] residents in the elevator," Ostrove Decl., Ex. 11 at 1, ECF No. 162-38 at 1; and "walking her dog off the leash in the public spaces of the building," Moschella Aff., Ex. E at 1, ECF No. 143-5.  In a July 2010 letter, Tudor notified Mazzocchi that Doe's dog had "[a]pparently . . . snapped aggressively at residents in the elevator," and that Mazzocchi would "now [be] required to muzzle [his] dog when walking the dog in the public spaces of the building."[7]  Moschella Aff., Ex. F at 1, ECF No. 143-6.

During the same time period, the Board began to explore its legal options.  Minutes from

---

[6] Mazzocchi owns a real estate company, which owns an apartment building at 425 Keap Street in Brooklyn.  Pl. Dep. 8-9.  The offices of the real estate company are located in the apartment building.  *Id.* 24.  In 2010, Mazzocchi moved from 5 Tudor City Place to 425 Keap Street.  Pl. Decl. ¶ 71.

[7] Mazzocchi states that he received only the October 2009 and July 2010 letters, Pl. Decl. ¶ 70, and that the requirement that the dog be muzzled was "waived" by Tudor employee Janice McDowall after Mazzocchi explained to her over the phone that Doe had bipolar disorder and that the dog was a "comfort dog," Pl. Dep. 104-05.

the September 16, 2010 Board meeting reflect that Thomas Curtis, the Board's lawyer, "is working on this illegal sublet case."[8]  Ostrove Decl., Ex. 15, ECF No. 162-38 at 9.  The Board then sent a notice of default dated February 16, 2011 to Mazzocchi at his Brooklyn address. Moschella Aff., Ex. G at 1, ECF No. 143-7.  The notice stated that "the current occupant or subtenant, who we are informed is known as [Jane Doe], is occupying the apartment without the consent of the Board of Directors," in violation of the terms of the proprietary lease, and that "failure to remove [Doe] from Apartment 821" within ten days "will result in the Board of Directors terminating your Proprietary Lease."[9]  Id.  The notice also stated that "the conduct of [Doe] is objectionable in that (a) she accosts other residents of the building and acts in an objectionable manner toward them and (b) she harbors a dog which snaps aggressively at other residents of the building."[10]  Id.  Doe remained in the Apartment, and, by letter dated April 14, 2011, the Board asked Mazzocchi to appear at a Board meeting on May 4, 2011, where he would be "given an opportunity to explain [his] refusal to remove [Doe from the Apartment]" and his failure to respond to the February 16 letter.  Moschella Aff., Ex. H at 1, ECF No. 143-8.  The letter stated, *inter alia*, that Mazzocchi's failure to attend the meeting would result in the Board

---

[8] Asked during his deposition about a reference in the Board minutes from an August 19, 2010 meeting to Curtis' having been retained by the Board to "resolve the issue" relating to Apartment 821, Hernandez stated that he understood the "issue" to refer to "[Doe's] behavior."  Hernandez Dep. 125-26.

[9] The proprietary lease provides that the lease can be terminated "[i]f there be an assignment of this Lease, or any subletting hereunder, without full compliance with the requirements of Paragraph[] 15 . . . ."  Proprietary Lease ¶ 31(c), Moschella Aff., Ex. A, ECF No. 143-1.  Paragraph 15 provides that "[a] resident-shareholder may sublet the whole or part of the Apartment, ONE (1) TIME ONLY for a term not to exceed three (3) years without obtaining the consent of the Board of Directors or Shareholders.  For any subsequent subletting, the Lessee shall not sublet . . . unless consent thereto shall have been duly authorized by a resolution of the Directors, or given in writing by a majority of the Directors or, if the Directors shall have failed or refused to give such consent, then by Lessees owning at least two-thirds (2/3) of the then issued shares of the Lessor."  *Id.* ¶ 15.

[10] The proprietary lease provides that a lease can be terminated "[i]f at any time the Lessor shall determine, upon the affirmative vote of two-thirds of its then Board of Directors, at a meeting duly called for that purpose, that because of objectionable conduct on the part of the Lessee, or of a person dwelling or visiting in the Apartment, repeated after written notice from Lessor, the tenancy of the Lessee is undesirable; (it being understood, without limiting the generality of the foregoing, that repeatedly violating or disregarding the House Rules hereto attached or hereafter established in accordance with the provisions of this Lease, shall be deemed to be objectionable conduct."  Proprietary Lease ¶ 31(f).

"hear[ing] from Tudor Realty Services in [Mazzocchi's] absence as to the unauthorized

occupancy of the unit, the objectionable conduct of said occupant, and [Mazzocchi's] failure to

correct that default under the Proprietary Lease." *Id.* The letter also stated that the meeting

could result in the termination of Mazzocchi's lease. *Id.* at 1-2.

B.  The Board's May 4, 2011 Meeting

On May 4, 2011, the Board held a meeting at which Curtis questioned Building staff,

residents, commercial tenants, and Board members about Doe's conduct. *See* May 4 Tr.

Mazzocchi did not attend.[11]  *Id.*  During the meeting, participants told the Board that they had

observed Doe dancing in front of the Building in the presence of children while wearing tight,

revealing clothing, *id.* 21-23, 36, 58-59, 73-75, 82-86 (Hernandez, Sullivan, Beceriklisoy, Cruz,

Gilbert),[12] and that Doe allowed her 50-pound bulldog to walk around the Building unleashed,

*id.* 7-8, 25-27 (Hernandez, Sullivan).[13]  Meeting participants also cited instances when Doe had

cursed at or verbally threatened them. Edgard Altuzarra, a commercial tenant, said that on one

occasion, he was standing outside the Building with another person when Doe "charged" toward

them, rolled up her sleeves as though she was preparing to hit them, and said, "[y]ou [expletive],

you want something with me?  I can take both of you right now." *Id.* 16.  Altuzarra said that Doe

did not touch him on that occasion, though she has continued to say "you want something?" each

time she sees him. *Id.* 16-17.  Aldaberto Cruz, the Building's head doorman, recounted an

---

[11] Mazzocchi states that he did not attend because the notice of default was sent to his address in Brooklyn rather than, as Mazzocchi contends is required by the proprietary lease, to 5 Tudor City Place, and because he "did not want to waive [his] right to challenge this improper service." Pl. Decl. ¶ 70.

[12] Meeting participants offered varying accounts of how revealing Doe's clothing was. *Compare* May 4 Tr. 83 (Gilbert) ("I would describe it the level of a small bikini and this is with clothes—outer clothing but pulled opened and deliberately exposing her torso, her belly . . . ."), *with id.* 22 (Sullivan) (noting that "at times" Doe's nipples will be exposed, and that she "sit[s] on a lawn chair with her legs up with no panties").

[13] Although Hernandez stated that Doe's dog approaches other occupants of the building in a threatening way and regularly bares its teeth, Sullivan said that he did not feel threatened by the dog and had not seen it bare its teeth. *Compare* May 4 Tr. 7-8 (Hernandez), *with id.* 25-27 (Sullivan).

incident when Doe responded to his greeting by cursing at him, telling him "go back to your country," and saying that she would come to his house, kill his wife and children, and castrate him. *Id.* 51. On another occasion in March or April 2011, Hernandez called the police because Doe "was verbally abusive" to Brian Rivera, a Building employee, "and threatened him with physical harm." *Id.* 77; *see also* Hernandez Aff., Ex. G, ECF No. 142-7 (written statement of Brian Rivera provided to the Board during the May 4, 2011 meeting).

Other meeting participants also recounted instances when Doe acted aggressively, and attributed Doe's conduct to mental illness, repeatedly described Doe as "crazy," or referred to Doe being "not on her meds." Frank Beceriklisoy, a commercial tenant, told the Board that Doe had begun regularly cursing at him after a dispute a few years prior involving Doe's dog. May 4 Tr. 38-42. Beceriklisoy generally tried to ignore Doe, but when Doe said on one occasion that she was "going to take care of [his] son and [his] daughter," Beceriklisoy began yelling and cursing at Doe because he felt that she was threatening his family. *Id.* 43. By way of apology, Doe later told Beceriklisoy, "the guy that is always walking with me, the guy with the black hair . . . told me to tell you, to curse you, and do these things to you." *Id.* 44. Beceriklisoy said that he "immediately grasped the idea of what was happening"; that he realized at that moment that Doe "was seeing things, and talking to some kind of a creature in her mind"; and that Doe "needs help—she's sick." *Id.* 44-45. Robert E. Sullivan, a resident, described instances when Doe directed racist and homophobic language at others in the Building, took candy off the shelves of the Building's convenience store and threw it at employees, and screamed while walking through the lobby. *Id.* 24, 30-31. Sullivan stated that Doe "apparently" has problems that are "mental of sorts" and that "when she's not on her meds, she's nuts, certifiably." *Id.* 27, 31. Sullivan added that although he had never seen Doe taking medication, she said on one occasion, "[o]h, I guess

I'm not on my meds today, you better watch out." *Id.* 32. Asked whether he felt that Doe was a danger to herself or others, Sullivan stated that "she's a danger to other people, because she just—you don't know when she's going to go. . . . [O]ne of these days she's going to do something really bad to somebody and hurt them . . . ." *Id.* 33. Likewise, although he did not expressly characterize Doe as mentally ill, Cruz repeatedly described Doe's conduct as "crazy." Cruz said that Doe "was normal" when he started working at the Building, but that "lately she's been acting like a little crazy." *Id.* 51. Cruz later recounted an incident when Doe "went up to [his] supervisor's face like going crazy" and stated again that Doe was "acting like crazy." *Id.* 56; *see also id.* 65 (again describing Doe as "crazy"). Similarly, although Moschella did not attribute Doe's conduct to mental illness, he told the Board that Mazzocchi once told him that Doe was "off her medication, therefore she's not right." *Id.* 92.

The Board also heard from Building staff, residents, commercial tenants, and Board members who expressed concern that Doe's conduct would negatively impact the Building's image and market value. Sullivan told the Board that Doe's conduct is a "killer right on the spot" for prospective co-op apartment purchasers, and that when tenants have "a buyer in [their] hands going in and this wacko is coming out, that's really going to jeopardize the sale." *Id.* 29, 31. Sullivan also said that "the problem here is that . . . the majority of the people in the building are de[]cent types," and that "it's unfair to do that to the tenants who are trying to keep the building in good [stead]." *Id.* 29-30. Likewise, Beceriklisoy told the Board that's Doe's conduct "doesn't look good for me personally," and that "[f]or business, of course, it is not good." *Id.* 46. Beceriklisoy added that when real estate agents show potential purchasers around the Building, "[Doe] comes and starts cursing . . . [o]r she's dancing half naked outside . . . [which] doesn't create a very good atmosphere for the building or for the businesses." *Id.* 46-47. These

11

comments were echoed by Gilbert, a Board member and Building resident, who stated that Doe's manner of dress "is not a proper sight for small children who do walk in front of the building" and "certainly isn't a good sight for the stores and the people in front." *Id.* 83. Likewise, Cruz told the Board that he has had to tell Doe on multiple occasions that she was "acting improperly," that "it does not look good for the building," and that "[t]his is Tudor City, this is a quiet environment, we want to keep it that way." *Id.* 59.

In addition to hearing statements from meeting participants, the Board was also provided with letters written by Building residents complaining of Doe's conduct.[14] In a February 2011 letter, Laura Piscitello wrote that Doe has made "inappropriate and obnoxious" comments to her regarding her weight and personal life, frequently uses derogatory and obscene language, and has been overheard by Piscitello screaming and threatening other residents—alarming Piscitello to the point that she has requested that Building staff escort her to and from her apartment, which is on the same floor as Doe's. Hernandez Aff., Ex. E at 1, ECF No. 142-5. Another resident, Terence King, wrote in an October 2009 letter that he is frequently awakened in the middle of the night by the sound of Doe pounding on the floor, often for an hour or more. Hernandez Aff., Ex. F at 1, ECF No. 142-6. King also wrote that his ceiling had sustained water damage and that he had been told by Building employees that the damage was caused by Doe's habit of leaving her bathtub running. *Id.*

Hernandez told the Board that Mazzocchi had not been living in the Apartment since Hernandez started working at Windsor in 2003 and that Doe was currently the Apartment's only occupant. May 4 Tr. 67. Moschella added that Mazzocchi had not submitted an application for permission to sublet the Apartment to Doe and that Mazzocchi had not paid sublet fees. *Id.* 88.

At the conclusion of the meeting, Gilbert stated that the Board had heard testimony that

---

[14] It is unclear from the record whether the Board in fact reviewed the letters during the meeting.

Doe's "behavior has deteriorated," that Mazzocchi had never submitted an application to designate Doe as a tenant, and that Mazzocchi did not appear at the meeting and "does not intend apparently to cure the situation." *Id.* 94. Gilbert then moved to terminate Mazzocchi's tenancy "[o]n the grounds of undesirable and illegal tenancy." *Id.* 95. Barsotti, Dunphy, Gilbert, Matten, and Taylor voted unanimously in favor of the motion. *Id.*

### C. Defendants' Stated Reasons for Terminating Mazzocchi's Lease

Defendants have submitted affidavits from each of the five Board members who voted to terminate Mazzocchi's tenancy. Each Board member states that they did not believe that Doe had any mental disability or impairment when they voted to terminate Mazzocchi's lease and to commence the ejectment proceeding. Aff. of Nancy Barsotti ¶ 10, ECF No. 149; Aff. of Maureen Dunphy ¶¶ 8-9, ECF No. 150; Aff. of Vivenne Gilbert ¶¶ 20, 22, ECF No. 145; Aff. of Paul Matten ¶ 6, ECF No. 147; Aff. of James Taylor ¶ 5, ECF No. 148. Dunphy, Gilbert, and Taylor instead state that they attributed Doe's conduct to the possibility that Doe was either an alcoholic or drug addict. Dunphy Aff. ¶ 7 ("My understanding of Jane Doe, having seen her in front of the building, was that she was either a drug addict or alcoholic, since her behavior towards others was aggressive, threatening and disturbing."); Gilbert Aff. ¶ 20 ("As Jane Doe exhibited aggressive and threatening behavior towards others, I have always believed that she may be an alcoholic or a drug addict."); Taylor Aff. ¶ 5 ("I don't know for sure what the reasons are for Jane Doe's aggressive, threatening and sexually inappropriate behavior . . . but it is quite conceivable that she may be a drug addict or alcoholic."). As such, Defendants contend that "mental disability/handicap played no role whatsoever in the decisions by the Board, nor by a single defendant, since none of us had any awareness that Ms. Doe was disabled/handicapped." Gilbert Aff. ¶ 23. Instead, each Board member states that based on, *inter alia*, the information

presented at the May 4, 2011 meeting, he or she voted to terminate Mazzocchi's lease due to "a legitimate concern to protect others and their property from the dangerous and harmful actions of Jane Doe, and due to Mr. Mazzocchi's lease violations which he would not cure." Gilbert Aff. ¶ 24; *accord.* Matten Aff. ¶ 7 ("I heard testimony on May 4, 2011 that gave me concern that Ms. Doe was a direct threat to [the] health and safety of others and their property and that was the reason I voted to terminate the lease based on the objectionable conduct of Jane Doe, which was in violation of . . . the Proprietary Lease."); *id.* ¶ 13 ("I also voted to terminate Mr. Mazzocchi's lease . . . because testimony was given at the hearing that Mr. Mazzocchi did not live in the building with Ms. Doe . . . and because he never requested the Board's permission to sublet the apartment to Ms. Doe for her sole occupancy."); Barsotti Aff. ¶ 6; Taylor Aff. ¶ 11; Dunphy Aff. ¶ 10.

Three Board members also stated in their affidavits that their personal observations of Doe's conduct were consistent with the conduct described at the May 4, 2011 meeting. Between 2007 and 2009, Barsotti saw Doe threatening building residents and doormen in the lobby of the Building. Barsotti Aff. ¶ 8 ("Not only did [Doe] state things like 'I will get you,' but she also threatened the families of at least two doormen, Aldaberto Cruz and Brian Rivera."). Barsotti also saw Doe's dog "act[] ferociously, by b[]aring its teeth and growling at passersby," and she "often felt that the dog would attack [her] if [she] got too close to it." *Id.* ¶ 9. In or around 2010, Taylor was in a Building elevator with his ten-year-old daughter, and Doe was using "extremely profane language" and "wearing very little clothing," with her pants "pulled down so low that her pubic hair was showing." Taylor Aff. ¶ 6. On another occasion, Matten "personally witnessed" Doe "having sex acts with her dog" in a public hallway of the Building. Matten Aff. ¶ 9; *see also* Matten Dep. 42. Specifically, Matten saw Doe "holding the dog in her arms" in the

14

eighth-floor hallway, with "[h]er pants . . . down all the way, and the dog's privates were by hers and they were moving."[15]  Matten Aff. ¶ 10.  Matten states that he was reminded of this experience when Cruz said at the May 4, 2011 meeting that Doe had made what he interpreted to be sexually suggestive comments to her dog.  *Id.* ¶ 11; *see* May 4 Tr. 64 (Cruz) (stating that he had witnessed Doe buying condoms in the Building's convenience store and "maybe a couple of hours later [Doe] came down and she's like—she's talking to the dog and she say, 'you did a good job.'").

Mazzocchi states that he informed a number of individuals affiliated with Windsor and Tudor that Doe had bipolar disorder, Pl. 56.1 ¶ 86, and that "[i]t is impossible to believe" that these individuals "never mentioned it at a board meeting or to the others, especially given the multiple conversations, letters, and meetings about Doe," Pl. Opp'n Br. 35, ECF No. 163.  First, in 2010, after Moschella asked Mazzocchi, "[w]hat are we going to do about your girlfriend?," Mazzocchi told Moschella that Doe should be left alone, that she does not harm anyone, and that she has bipolar disorder.  Pl. Dep. 95.  Moschella states that he does not recall Mazzocchi telling him that Doe had bipolar disorder, but does remember that Mazzocchi once told him that Doe "was off her meds."  Moschella Aff. ¶ 40.  Second, Mazzocchi states that he told Tudor employee Janice McDowall that Doe had bipolar disorder and that Doe's dog was a "comfort dog" after receiving Tudor's July 2010 letter requiring him to muzzle his dog.  Pl. Dep. 104-05.  Third, Mazzocchi states that he had an hour-long conversation about Doe's bipolar disorder with Hernandez and his assistant, Gerald Montano, when they delivered the April 14, 2011 letter to Mazzocchi in Brooklyn.  Pl. Decl. ¶ 76; Pl. Dep. 270-71.  Mazzocchi states that Hernandez told

---

[15] Matten's account is corroborated by an affidavit from Ruth Catapang, who was not present at the May 4, 2011 meeting but lived on the eighth floor of the Building for eight years and witnessed similar acts.  Aff. of Ruth Catapang, ECF No. 151.  Catapang recounts seeing Doe's dog "sitting on [Doe's] lap" with its genitalia "out and . . . red."  *Id.* ¶ 7.  Catapang states that Doe "was trying to get the dog to have sex with her" and that "[h]er pants were all the way down and the dog was on her lap."  *Id.* ¶ 8.  On another occasion, Catapang saw Doe "[hold] the dog's head and put it into her vagina area."  *Id.* ¶ 4.

him during that conversation that his son also had bipolar disorder, Pl. Decl. ¶ 76; Pl. Dep. 270-71, which Hernandez denies, Hernandez Aff. ¶ 40.  Finally, Mazzocchi states that he told Curtis, at some unspecified time, that Doe had a mental illness, Pl. Dep. 270, which Curtis acknowledged during Mazzocchi's deposition in a related action in state court, Dep. of Frank Mazzocchi in New York State Court 116, ECF No. 162-23.

### D.  The Ejectment Proceeding

After voting to terminate Mazzocchi's lease, the Board authorized the initiation of an ejectment proceeding against Mazzocchi on May 19, 2011.  Board Minutes for May 19, 2011 Meeting 2, Koplovitz Decl., Ex. C at 20, ECF No. 141-3.  Windsor then filed suit against Mazzocchi in state court in September 2011, seeking to eject Mazzocchi and Doe from the Apartment.  Verified Complaint, *Windsor Owners Corp. v. Mazzocchi*, No. 110714-2011 (N.Y. Sup. Ct. Sept. 20, 2011).  On March 11, 2014, the action was discontinued by Windsor "without prejudice to all parties' rights, claims and defenses."  Order, *Windsor Owners Corp.*, No. 110714/11 (Mar. 11, 2014); *see also* Koplovitz Decl., Ex. E at 1, ECF No. 141-5.

## IV.  Jane Doe's Participation in this Action

On November 4, 2011, Mazzocchi, proceeding *pro se*, filed this action, alleging, *inter alia*, that Doe suffers from bipolar disorder and that Windsor, Tudor and others discriminated against Doe and Mazzocchi because of Doe's disability.  ECF No. 1.  Doe was not named as a plaintiff.  *Id.*  Before filing this action, Mazzocchi told Doe that he was working on a "magnum opus," but Doe "didn't really understand what it was about."  Pl. Dep. 217.  Mazzocchi read Doe excerpts from the draft complaint, omitting portions that referred to Doe as having bipolar disorder.  *Id.*  When Mazzocchi asked Doe to join the lawsuit, Doe "want[ed] no part of it" and said that "[h]er father, meaning God, will punish all the people that have hurt her" and that the

dispute was "between [Mazzocchi] and the Board, not [Doe]." *Id.* 215-16.

On February 11, 2014, the Court issued an order that, *inter alia*, directed Mazzocchi to obtain Doe's consent to be named as a co-plaintiff or to initiate an Article 81 proceeding in state court requesting that Mazzocchi be appointed Doe's guardian. ECF No. 74. On March 14, 2014, Mazzocchi informed the Court that he would not be initiating an Article 81 proceeding. ECF No. 82. Mazzocchi later testified during his deposition that he asked Doe for her consent to be joined in the action and "she absolutely refused." Pl. Dep. 219. Mazzocchi did not broach the subject of initiating an Article 81 proceeding because "she'd go off the wall." *Id.* Elaborating on why he decided not to pursue an Article 81 proceeding, Mazzocchi stated that despite the fact that Doe is "up and down" mentally, "she's not incompetent . . . she's able to feed herself, she's able to go shopping, she takes care of the dog, does the laundry, she functions . . . she can do the mundane things that are necessary in life." *Id.* at 220. Mazzocchi added, however, that Doe is "not competent" in the sense that "she couldn't make a living" and "couldn't put a roof over her own head." *Id.* at 220. To date, Mazzocchi has neither obtained Doe's consent to join the action nor initiated an Article 81 proceeding.

Mazzocchi's prosecution of this action has reportedly upset Doe. Mazzocchi speculates that after this action was filed, someone told Doe about the allegations made in the complaint regarding her mental health. *Id.* at 217. Doe became upset and "accused [Mazzocchi] of telling the world that she was bipolar." *Id.* Mazzocchi contends that Doe "denies having [bipolar disorder]" and that she thinks that "being bipolar will mean that the world will see that she was born defective somehow and think of her as crazy." *Id.* at 64. On May 11, 2014, the New York Post ran an article on the litigation between Mazzocchi and Windsor and mentioned Doe's "refus[al] to accept a bipolar diagnosis." Kathianne Boniello, *Tudor City Board Made My*

17

*Girlfriend Crazy: Tenant*, New York Post (May 11, 2014), *available at*

http://nypost.com/2014/05/11/tudor-city-board-made-my-girlfriend-crazy-tenant/.  After the

article was published, Mazzocchi said that "everybody in the building was talking about it" and

"all of a sudden, they started to look at [Doe] in a different light."  *Id.* at 222.  As a result, Doe

"turned on [Mazzocchi] with a vengeance you would not believe."  *Id.* at 222-23.  Mazzocchi

states that Doe continues to be angry with him because he has "sought help for her mental illness

and aired her illness in the courts."  Pl. Decl. ¶ 16.

On December 10, 2014, pursuant to Federal Rule of Evidence 706, the Court appointed

Disability Rights New York ("DRNY") as the Court's expert to investigate and make

recommendations on how to protect Doe's legal interests.[16]  ECF No. 90.  On January 13, 2014,

Cliff Zucker of DRNY, in the presence of Mazzocchi and his lawyer, knocked on the door of the

Apartment and identified himself.  DRNY Report at 1, ECF No. 103.  Doe spoke to Zucker

through the door, which Doe did not open.  *Id.* at 1.  Zucker states in his report that Doe "was

clearly angry and felt betrayed that [Mazzocchi] had [brought a lawsuit concerning her]."  *Id.* at

2.  Doe also "strongly expressed the desire to be left alone by Mr. Mazzocchi and by [Zucker],

and [was] strongly opposed to any involvement in the lawsuit."  *Id.*  In his report to the Court,

Zucker recommended that "Ms. Doe's desire not to participate in this litigation be respected."

*Id.* at 3.  Zucker stated that although Doe "did present as a person who likely has a serious

mental illness" on the basis of his "decades of experience representing people with serious

mental illness," he could not conclude that Doe was incapable of deciding whether to be

involved in this litigation.  *Id.* at 2.  Nor, in his opinion, was Doe's refusal to participate

---

[16] Although the DRNY report is described here to provide background, the Court does not rely on the report in deciding whether Mazzocchi has established third-party standing or raised a genuine dispute of material fact as to his claim under Section 3604(f)(2) of the Fair Housing Act.

irrational or unreasonable:

> Because the claims in this case would put Ms. Doe's mental health in dispute, her involvement in the litigation is likely to be quite personally intrusive, and would likely involve discovery of her psychiatric records, possible depositions of her treating physicians, a deposition and/or independent medical examination of Ms. Doe, and a public trial at which her mental health will be a major focus. I cannot say with certainty whether Ms. Doe's refusal to participate in this litigation is based upon a rational weighing of the risks and benefits[,] . . . [b]ut there is nothing inherently irrational about declining to litigate a claim when success is uncertain; the relief that will be obtained, if any, is uncertain; and the discomforts of litigation are a certainty.

*Id.*

V. Procedural History

Following dismissal without prejudice of the original complaint in this action, *Mazzocchi v. Windsor Owners Corp. ("Mazzocchi I")*, No. 11 Civ. 7913, 2012 WL 3288240 (S.D.N.Y. Aug. 6, 2012), Mazzocchi filed an amended complaint alleging, *inter alia*, violations of the Americans with Disabilities Act and the Fair Housing Act. ECF No. 38. On September 17, 2013, this Court dismissed all of Mazzocchi's claims except for (1) Mazzocchi's disparate treatment claim under Section 3604(f)(2) of the FHA on the basis of Doe's alleged mental disability as against Windsor, Tudor, Barsotti, Dunphy, Gilbert, and Matten, and (2) Mazzocchi's claim of conspiracy to violate the FHA under 42 U.S.C. § 1985(3) against Windsor and Tudor. *Mazzocchi v. Windsor Owners Corp. ("Mazzocchi II")*, No. 11 Civ. 7913, 2013 WL 5295089 (S.D.N.Y. Sept. 17, 2013), *as corrected by* ECF No. 108.

On February 11, 2014, the Court issued an order (1) finding that Mazzocchi had failed to join a necessary party, Doe, pursuant to Rule 19(a), and (2) directing Mazzocchi to obtain Doe's consent to be named as a co-plaintiff or to file an Article 81 proceeding in state court requesting that Mazzocchi be appointed Doe's guardian. ECF No. 74. After Mazzocchi failed to take either

step, the Court considered whether the action should be dismissed pursuant to Rule 19(b), ruling

on November 24, 2014 that dismissal for nonjoinder was not warranted.  ECF No. 87.

Defendants' motion for summary judgment followed.  ECF No. 140.

## DISCUSSION

Defendants move for summary judgment on all claims, arguing that Mazzocchi (1) lacks

third-party standing to bring claims on behalf of Doe and (2) has not raised a genuine dispute of

material fact as to his claims under Section 3604(f)(2) of the FHA and 42 U.S.C. § 1985(3).

I.      Summary Judgment Standard

Summary judgment may be granted only if the court concludes that there is no genuine

dispute as to any material fact and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Feingold v. New

York*, 366 F.3d 138, 148 (2d Cir. 2004).  A dispute is genuine when there is sufficient evidence for

a reasonable jury to return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  Material facts are those which may affect the outcome of a case.  *Id.*  In

assessing the record to determine whether there is a genuine dispute to be tried, courts are required

to resolve all ambiguities and draw all permissible factual inferences in favor of the party against

whom summary judgment is sought.  *Id.* at 255.

The moving party initially bears the burden of informing the court of the absence of a

genuine dispute of material fact by citing to particulars in the record.  Fed. R. Civ. P. 56(c);

*Celotex*, 477 U.S. 317 at 322-25; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002).

The movant may satisfy its burden by "showing that the materials cited do not establish the

absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(B).  If the non-moving party

has the burden of proof on specific issues, the movant may also satisfy its own initial burden by

demonstrating that the adverse party cannot produce admissible evidence to support an issue of

fact. *Celotex*, 477 U.S. at 322-23; *PepsiCo Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir.

2002).

If the moving party meets its initial burden, the burden then shifts to the opposing party

to establish a genuine dispute of fact. *Beard v. Banks*, 548 U.S. 521, 529 (2006); *Santos v.

Murdock*, 243 F.3d 681, 683 (2d Cir. 2001). The opposing party may not avoid summary

judgment by relying solely on conclusory allegations or denials that are unsupported by factual

data. *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).

Instead, the opposing party must set forth "specific facts showing that there is a genuine issue for

trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).

II.     The Admissibility of the Fieve Report

Because only admissible evidence need be considered on summary judgment, *see Raskin

v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir. 1997), the Court first addresses Defendants' motion to

strike the expert report of psychiatrist Ronald R. Fieve, M.D., which was submitted by

Mazzocchi in opposition to summary judgment. *See* Fieve Report, Ostrove Decl., Ex. 9, ECF

No. 162-36. Fieve does not purport to diagnose Doe with bipolar disorder. Indeed, he writes in

the report that his opinion "should not and cannot be considered a diagnosis of Ms. Doe's mental

state" and that making such a diagnosis would require "consult[ing] with [] Doe to determine

whether she agrees with the events described in the transcript provided to me and to also

examine and determine if there are other factors for her said behavior." *Id.* at 1-2. Instead, Fieve

opines that Doe's conduct, based on his review of a transcript of the May 4, 2011 Board meeting,

is consistent with "text book descriptors" of bipolar disorder "as seen in the DSM-5 Diagnosis

Criteria," *i.e.*, "mood swings, irritability, hostility, psychosis, delusions and inappropriate display

21

of her body." *Id.* at 1; *see also* Pl. Opp'n Mot. Strike 5, ECF No. 166 ("The conclusion is that Doe exhibits behaviors associated with bipolar disorder. The reason is behaviors she exhibited are consistent with the behaviors identified in the DSM-V for bipolar diagnosis.").

In determining the admissibility of expert testimony under Federal Rule of Evidence 702, the trial court plays a "'gatekeeping' function" and "is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 597 (1993)). In fulfilling this role, the trial court must determine whether (1) the witness is qualified as an expert to testify as to a particular matter; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony as to a particular matter will assist the trier of fact. *See, e.g.*, *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). Whether a witness' expertise is technical, scientific, or experience-based, the court must "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). The proponent of the evidence bears the burden to show by a preponderance of the evidence that the proffered testimony meets the requirements of Rule 702. *See, e.g.*, *Soley v. Wasserman*, No. 08 Civ. 9262, 2013 WL 3185555, at *9 (S.D.N.Y. June 21, 2013).

Even assuming that Fieve is qualified as an expert, his report is inadmissible because Mazzocchi has failed to provide any basis for the Court to determine whether the report is based on reliable data and methodology. In conducting this inquiry, trial courts are guided by the "indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods;

and (3) that the witness has applied these principles and methods reliably to the facts of the

case." *Amorgianos*, 303 F.3d at 265 (internal quotation marks omitted); *see also Daubert*, 509

U.S. at 593-94 (enumerating other relevant factors).   Fieve's determination that Doe's behavior

is consistent with "text book descriptors" of bipolar disorder from the DSM-5 rests entirely on

his review of the transcript of the May 4, 2011 Board meeting where Building staff, residents,

commercial tenants, and Board members described Doe's behavior.   Mazzocchi, however, has

not met his burden of showing that a psychiatric expert may reliably reach this conclusion on the

basis of such a transcript without conducting, for example, an in-person examination of Doe or a

review of her medical records.[17]   *Cf. Qube Films Ltd. v. Padell*, No. 13 Civ. 8405, 2016 WL

888791 (S.D.N.Y. Mar. 1, 2016) (noting that a diagnosis, as opposed to a conclusion that an

individual's symptoms are consistent with the DSM-5, reached on the basis of a "medical history

interview, patient observation, a physical examination, and administration of standard

psychological tests" is "routinely accepted under *Daubert*").   In the absence of evidence of the

applicable standards used in the psychiatric community for determining whether an individual's

behavior is consistent with the DSM-5, or some other evidence bearing on the reliability of

Fieve's data and methodology, *see Amorgianos*, 303 F.3d at 266, the Court cannot fulfill its

"gatekeeping function" to ensure that Fieve's report "rests on a reliable foundation," *id.* at 265

(quoting *Daubert*, 509 U.S. at 597).

   Accordingly, Defendants' motion to strike the report is GRANTED,[18] and the Court will

---

[17] Mazzocchi argues that Fieve's report is reliable because it draws on the DSM-5, which has formed the basis for medical evidence accepted by other courts in this District. *See Veryzer v. Am. Intern. Life Assur. Co. of New York*, No. 09 Civ. 8229, 2012 WL 6720932, at *3 n.3 (S.D.N.Y. Dec. 27, 2012). Mazzocchi misses the point. The question before the Court is not whether the DSM-5 is itself a reliable source, but whether Fieve employed reliable data and methodology in concluding that Doe's conduct is consistent with the "text book descriptors" of bipolar disorder contained in the DSM-5.

[18] Defendants' motion pursuant to Rule 37 to preclude Mazzocchi from offering witnesses at trial who were not identified in Mazzocchi's initial Rule 26 disclosure is premature and, therefore, DENIED without prejudice to

not consider it in ruling on Defendants' motion for summary judgment.[19]

III.   Third-Party Standing

Article III of the Constitution limits the jurisdiction of the federal courts to the resolution

of "cases" and "controversies." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d

Cir. 2011). To ensure that Article III is satisfied, courts require plaintiffs to demonstrate that

they have "standing" to bring suit, *i.e.*, that they have suffered injury that is traceable to the

defendant and can be redressed by the court. *Id.* In addition, plaintiffs must comply with

prudential limitations on standing, including the rule that a party "generally must assert his own

legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third

parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). This prudential limitation on third-party

standing requires that courts "hesitate" before allowing the assertion of third-party rights in order

to "avoid[] . . . the adjudication of rights which those not before the Court may not wish to

assert" and to "assur[e] that the most effective advocate of the rights at issue is present to

champion them." *Singleton v. Wulff*, 428 U.S. 106, 113 (1976); *Duke Power Co. v. Carolina*

*Env. Study Group Inc.*, 438 U.S. 59, 80 (1978). Plaintiffs have nevertheless been permitted to

sue on behalf of third parties where (1) the litigant has "suffered an 'injury in fact,' thus giving

him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute"; (2) the

litigant has "a close relation to the third party"; and (3) there exists "some hindrance to the third

party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991);

*see also Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168,

---

renewal. Defendants may renew their motion prior to trial pursuant to Rule III.C of this Court's Individual Practices in Civil Cases.

[19] Defendants' motion to strike the declaration of Frank Mazzocchi dated May 23, 2016 at ECF No. 181-2 is also GRANTED as Mazzocchi did not obtain leave of the Court to submit new evidentiary material in opposition to the motion for summary judgment. In any event, having considered the declaration, the Court finds that it would not have altered the Court's ruling.

174 (2d Cir. 2005).

In this action, Mazzocchi seeks to assert Doe's rights under the FHA, arguing that he has met his burden in establishing third-party standing. *See Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 79 (2d Cir. 2013) ("To defend against summary judgment for lack of standing, a plaintiff 'must set forth by affidavit or other evidence specific facts' supporting standing, as is generally required under Rule 56." (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992))). However, even assuming that Mazzocchi has shown "injury-in-fact" and a "close relation" to Doe, Mazzocchi's bid for third-party standing fails because he does not establish, by setting forth specific facts, the existence of a "hindrance" to Doe's ability to protect her own interests.

In permitting departures from the prudential limitation on third-party standing, courts have required a showing of hindrance because it suggests that the third party's absence from suit "more likely stems from disability than from disinterest." *Miller v. Albright*, 523 U.S. 420, 450 (1998) (O'Connor, J., concurring) ("A hindrance signals that the rightholder did not simply decline to bring the claim on his own behalf, but could not in fact do so."). Under such circumstances, "the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent." *Singleton*, 428 U.S. at 116.

In some cases, the effects of mental illness may create a hindrance sufficient to permit third-party standing. As courts have acknowledged, the societal stigma associated with receiving mental healthcare can "blunt mental health patients' incentive to pursue litigation." *Pennsylvania Psychiatric Soc. v. Green Spring Health Servs.*, Inc., 280 F.3d 278, 290 (3d Cir. 2002); *see also Aid for Women v. Foulston*, 441 F.3d 1101, 1114 (10th Cir. 2006); *King v.*

*Governor of the State of New Jersey*, 767 F.3d 216, 244 (3d Cir. 2014).  Aside from stigma, the disability caused by mental illness may also affect an individual's ability to assert his or her legal claims.  *Pennsylvania Psychiatric Soc.*, 280 F.3d at 290; *see also Am. Psychiatric Ass'n*, 2016 WL 2772853, at \*6; *Am. Psychiatric Ass'n v. Anthem Plans, Inc.*, No. 14 Civ. 3993, 2016 WL 2772853, at \*6 (2d Cir. May 13, 2016) (acknowledging the proposition "that stigma and disability often hinder the ability of [psychiatric] patients to protect their own interests").  Together, the "fear of stigmatization, coupled with . . . potential incapacity to pursue legal remedies, operates as a powerful deterrent to bringing suit," *Pennsylvania Psychiatric Soc.*, 280 F.3d at 290, and can hinder a party's ability to protect his or her own interests.

The mere invocation of mental illness, however, cannot serve as carte blanche for third-party standing.  To establish a hindrance on the basis of mental illness, the party asserting standing must show not only the existence of a mental illness, but also that some consequence of the mental illness—be that societal stigma, incapacity, or some other result of the illness—hinders the allegedly impaired person's ability to protect his or her own interests.  *See King*, 767 F.3d at 244 ("While a fear of social stigma can in some circumstances constitute a substantial obstacle to filing suit, [p]laintiffs' evidence does not sufficiently establish the presence of such fear here."); *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 215 (4th Cir. 2002); *McGRX, Inc. v. Vermont*, No. 10 Civ. 1, 2011 WL 31022, at \*10 (D. Vt. Jan. 5, 2011).  In addition to safeguarding the objectives served by the prudential limitation on third-party standing discussed *supra*, this case-by-case approach prevents courts from presuming that those suffering from mental illness are *per se* incapable of deciding whether to assert their legal rights.  *See, e.g.*, *Freilich*, 313 F.3d at 215 ("[W]e cannot simply assume that every disabled or chronically ill person is incapable of asserting his or her own claims.").

In arguing that Doe is hindered from protecting her own interests, Mazzocchi's principal argument is that Doe is in denial of the fact that she has bipolar disorder, in part because she fears the societal stigma that would come with such a diagnosis. This theory of denial may be sufficient in some circumstances to permit third-party standing, whether such denial results from disabilities caused by the mental illness itself, a fear of stigmatization, or some other result of the mental illness. *See Mazzocchi II*, 2013 WL 5295089, at *6. ("According to the allegations, Doe's bipolar disorder renders her unable to understand that she has bipolar disorder. Because she does not believe she is disabled . . . , she cannot enforce her own rights."). However, at summary judgment, Mazzocchi is required to support his allegations with specific facts. *Nat. Res. Def. Council*, 710 F.3d at 79. Mazzocchi's evidence on this front is sparse and drawn exclusively from his own statements that Doe "denies having [bipolar disorder]" and thinks that "being bipolar will mean that the world will see that she was born defective somehow and think of her as crazy." Pl. Dep. 64; *see also, e.g.*, Pl. Decl. ¶ 53 ("[Doe] insist[s] that 'there is nothing wrong [with] her.' She accuses me of trying to label her bipolar."). These self-serving statements regarding Doe's alleged state of mind are uncorroborated by any other admissible evidence and are insufficient, without more, to support third-party standing. Even assuming that Mazzocchi could establish that Doe suffers from bipolar disorder or some other mental illness, this would not—without some evidence of hindrance resulting from the mental illness—compel the conclusion that Doe is unable to protect her own legal interests. The Court recognizes that Mazzocchi may have had difficulty substantiating his theory of denial due to Doe's unwillingness to participate in this litigation. These difficulties, however, highlight the policy concerns underlying the prudential limitation on third-party standing. *See Singleton*, 428 U.S. at 113-14 (explaining that courts generally disallow third-party standing to "avoid[] . . . the

adjudication of rights which those not before the Court may not wish to assert" and to "assur[e]

that the most effective advocate of the rights at issue is present to champion them").

The Court also cannot ignore the substantial evidence that Doe is opposed to

Mazzocchi's prosecution of her FHA claims. *Caplin & Drysdale, Chartered v. United States*,

491 U.S. 617, 623 n.3 (1989) (noting that third-party standing analysis should take into account

"the impact of the litigation on third-party interests"). The prudential limitation on third-party

standing is designed to ensure that a third party's absence from suit "more likely stems from

disability than from disinterest," *Miller*, 523 U.S. at 450, and to "avoid[] . . . the adjudication of

rights which those not before the Court may not wish to assert," *Singleton*, 428 U.S. at 113-14.

These concerns are squarely implicated here. Mazzocchi admits in his deposition testimony that

before he filed this lawsuit, he did not fully disclose to Doe the claims and allegations he would

be making regarding her mental health; that Doe has been distressed and angered by

Mazzocchi's filing of this action; and that Doe has refused to consent to join this litigation

despite repeated entreaties. Pl. Dep. 215-17, 219, 222-23. The Court does not doubt the

sincerity of Mazzocchi's belief that he is acting in Doe's best interest by pursuing litigation

against Defendants; nevertheless, Mazzocchi cannot assume responsibility for Doe's legal

interests in the absence of sufficient evidence that Doe is hindered from protecting them.[20]

Accordingly, because Mazzocchi has failed to meet his burden to set forth specific facts

supporting third-party standing, Mazzocchi's claims brought on behalf of Doe are DISMISSED.

---

[20] Mazzocchi also argues that Doe must be incapable of protecting her legal rights because she refused to defend herself in the ejectment proceeding initiated by Windsor. *See* Pl. Opp'n Br. 15 ("[A] rational person would cooperate and participate in a defense in order to remain in a familiar dwelling that one has known for the last twenty years."). This argument is unavailing. Doe may have had myriad reasons for declining to participate in the defense of the ejectment proceeding, and her refusal to do so is insufficient, without more, to demonstrate a hindrance to her ability to protect her interests. Moreover, to the extent that Mazzocchi is attempting to argue that Doe's conduct shows that she is so cognitively impaired that she is incapable of making decisions regarding her legal affairs, the Court rejects that argument for substantially the same reasons as it finds that Mazzocchi has not raised a genuine dispute of fact under Section 3602(h)(1) of the FHA as to whether Doe is substantially limited in her ability to think, concentrate, and function cognitively, as discussed *infra*.

IV.   Mazzocchi's Ability to Sue Under the FHA

Defendants bring two threshold challenges to Mazzocchi's ability to sue under the FHA, arguing that Mazzocchi lacks standing and that the alleged conduct does not fall within the scope of Section 3604(f)(2) of the FHA.  For the following reasons, the Court rejects these arguments.

A.  Standing

As discussed *supra*, the constitutional standing doctrine requires plaintiffs to demonstrate that they have suffered injury-in-fact that is traceable to the defendant and can be redressed by the court.  *Amidax Trading Grp.*, 671 F.3d at 145.  Mazzocchi has satisfied these requirements. The factual record shows that Mazzocchi was subjected to, *inter alia*, the imminent threat of the loss of his residence, and that these injuries-in-fact resulted from Defendants' actions and are redressable by this Court.  Defendants argue nonetheless that Mazzocchi lacks standing because his claims became moot after Defendants discontinued the ejectment proceeding and Doe remained in the Apartment.  This argument fails.  Mazzocchi stands to recover monetary damages for his claims under the FHA and thus retains a "legally cognizable interest in the outcome" of the action.  *See Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993) ("[A] viable claim for damages generally avoids mootness of the action.").  Moreover, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).  Defendants discontinued the ejectment proceeding without prejudice to renewal, and they have not met their burden to demonstrate that "(1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Lamar Advert. of Penn, LLC v. Town of Orchard Park, New York*, 356 F.3d 365, 375 (2d Cir. 2004).  Accordingly,

the Court rejects Defendants' mootness challenge and concludes that Mazzocchi has standing to

bring his FHA claims.

     B.  "Post-Acquisition" Liability Under the FHA

     Defendants also seek to foreclose Mazzocchi from suing under the FHA on the theory

that "post-acquisition" liability—*i.e.*, liability for discrimination that occurs after the initial rental

or sale of a dwelling—is not available under Section 3604(f)(2) of the FHA. *See, e.g., Halprin v.*

*Prarie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 329-30 (7th Cir. 2004)

(holding that Section 3604 does not provide for post-acquisition liability because, *inter alia*, the

legislative history of the FHA indicates that it was only meant to protect against discrimination at

the point of initial rental or sale).[21]  Although the Second Circuit has not ruled on the availability

of post-acquisition liability under Section 3604 of the FHA, *see Khalil v. Farash Corp.*, 277 Fed.

App'x 81, 84 (2d Cir. 2008) (summary order) (assuming without deciding that a hostile housing

environment claim based on post-acquisition conduct could be brought under the FHA), courts in

this Circuit have found provisions of the FHA to reach post-acquisition discrimination, even

where the discriminatory conduct does not rise to the level of actual or constructive eviction, *see,*

*e.g., Davis v. City of New York*, 902 F. Supp. 2d 405, 436 (S.D.N.Y. 2012) ("[T]he law is best

understood to prohibit post as well as pre-acquisition discrimination in the provision of housing-

related services."); *Cain v. Rambert*, No. 13 Civ. 5807, 2014 WL 2440596, at *4 (E.D.N.Y. May

30, 2014) ("Courts in this Circuit have construed § 3604(b) of the FHA to prohibit the creation of

a 'hostile environment' by individuals who have control or authority over the 'terms, conditions,

---

[21] Even in the circuits that restrict post-acquisition liability under Section 3604, such claims are viable in cases of actual or constructive eviction. *See Bloch v. Frischholz*, 587 F.3d 771, 776 (7th Cir. 2009) ("A landlord would be required to rent to an African-American but then, the day after he moves in, could change all the locks and put up signs that said, 'No blacks allowed.' That clearly could not be what Congress had in mind . . . ."); *Cox v. City of Dallas*, 430 F.3d 734, 746 (5th Cir. 2005) ("§ 3604(b) may encompass the claim of a current owner or renter for . . . actual or constructive eviction.").

or privileges or sale or rental of a dwelling' . . . ."); *Viens v. America Emp. Surplus Lines Ins.*

*Co.*, 113 F. Supp. 3d 555, 567-69 (D. Conn. 2015). In *Davis*, the court held that post-acquisition

conduct was actionable under Section 3604(b) for three reasons: (1) the statutory language

includes the word "privileges", which "implicates continuing rights, such as the privilege of

quiet enjoyment of the dwelling," 902 F. Supp. 2d at 436; (2) limiting the FHA to claims brought

at the point of acquisition would "insulate egregious post-acquisition actions from the law's

reach," *id.* at 436 (quoting Rigel Oliveri, *Is Acquisition Everything? Protecting the Rights of*

*Occupants Under the Fair Housing Act*, 43 Harv. C.R.-C.L. L. Rev. 1, 32-33 (2008) (noting that

if post-acquisition liability were unavailable, "it would not violate [the FHA] for a condominium

owners' association to prevent a disabled person from using the laundry facilities or for a

landlord to refuse to provide maintenance to his Hispanic tenants . . . [or] to sexually harass a

tenant or to raise the rent of only Jewish tenants"); and (3) reading the FHA to prohibit post-

acquisition discrimination "comports with the interpretation of the Department of Housing and

Urban Development ("HUD") and with the interpretation of the Department of Justice," *id.* at

436-37 (quoting *Bloch v. Frischholz*, 587 F.3d 771, 776 (7th Cir. 2009) ("[T]he Supreme Court

has . . . recognized that HUD's views about the meaning of the FHA are entitled to 'great

weight.'"). The Court agrees with the reasoning articulated in *Davis*, which applies with equal

force to Section 3604(f)(2), the text of which mirrors Section 3604(b). *Compare* § 3604(b)

(prohibition on discrimination in the "terms, conditions, or privileges of sale or rental of a

dwelling, or in the provisions of services or facilities in connection therewith"), *with* § 3604(f)(2)

(prohibition on discrimination in the "terms, conditions, or privileges of sale or rental of a

dwelling, or in the provisions of services or facilities in connection with such dwellings"). *See*

*also Cabrera v. Jakabovitz*, 24 F.3d 372, 388 (2d Cir. 1994) (stating that Section 3604 should be

given "broad and liberal construction"); *Trafficante v. Metropolitan Life*, 409 U.S. 205, 209, 212 (1972) (stating that the FHA's terms are "broad and inclusive" and that the FHA merits "generous construction"). Accordingly, the Court finds that Section 3604(f)(2) of the FHA reaches post-acquisition conduct—even where that conduct falls short of constructive or actual eviction—and that Mazzocchi may premise his Section 3604(f)(2) claim on conduct that occurred after his tenancy began.

V.     Section 3604(f)(2) of the FHA

To prevail at summary judgment on his claim under Section 3604(f)(2) of the FHA, Mazzocchi must raise a genuine dispute of fact as to (1) whether Doe was disabled within the meaning of the FHA, *Rodriguez v. Village Green Realty, Inc.*, 788 F.3d 31, 40 (2d Cir. 2015), and (2) whether Defendants took adverse action against Mazzocchi that was motivated, at least in part, by Doe's disability, *MHANY Mgmt. Inc. v. Cty. of Nassau*, 819 F.3d 581, 613 (2d Cir. 2016). The Court concludes that Mazzocchi has met these requirements.

A.     Disability Under the FHA

Section 3604(f)(2) of the FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap . . . ." 42 U.S.C. § 3604(f)(2).[22] As such, because Section 3604(f)(2) "prohibit[s] action taken 'because of . . . handicap,'" it "require[s] that plaintiffs show the existence of a disability within the meaning of

---

[22] Section 3604(f)(2) does not limit recourse to the person whose "handicap" engendered the challenged discriminatory action. Rather, any individual facing discrimination due to the disability of a person "residing in" the individual's dwelling or the disability of a person with whom the individual is "associated" can bring suit under Section 3604(f)(2). *See* § 3604(f)(2)(B)-(C). Because Doe is "associated" with Mazzocchi and Doe resides in the Apartment, the Court finds that Mazzocchi falls within the scope of persons who can bring a cause of action under Section 3604(f)(2) of the FHA.

the FHA in order to state a claim . . . ." *Rodriguez*, 788 F.3d at 40.[23]  To show the existence of a

disability under the FHA, a plaintiff must establish that he or she has "(1) a physical or mental

impairment which substantially limits one or more of such person's major life activities, (2) a

record of having such an impairment, or (3) [is] regarded as having such an impairment." 42

U.S.C. § 3602(h); *see also Rodriguez*, 788 F.3d at 40 (referring to Section 3602(h)(1) as the

"'actually disabled' test" and Section 3602(h)(3) as the "'regarded as' test").  The Court

concludes that although Mazzocchi has not raised a genuine dispute of fact as to whether Doe

was actually disabled or had a record of impairment, Mazzocchi has established a triable issue of

fact as to whether Doe was "regarded as having such an impairment."

### i. Actually Disabled

Under the "actually disabled" test, an individual is considered to have a disability if he or

she "(1) suffers from a physical or mental impairment, that (2) affects a major life activity, and

(3) the effect is substantial." *Rodriguez*, 788 F.3d at 41 (quoting *Reg'l Econ. Cmty. Action

Program, Inc. v. City of Middletown*, 294 F.3d 35, 46 (2d Cir. 2002) ("RECAP")).[24]  Major life

activities include "functions such as caring for one's self, performing manual tasks, walking,

seeing, hearing, speaking, breathing, learning and working." *Id.* (quoting *RECAP*, 294 F.3d at

47).  A major life activity is "substantially limited" if the impairment "prevent[s] or severely

restrict[s]" the major life activity and has a "permanent or long term" impact. *Rodriguez*, 788

---

[23] Consistent with Second Circuit practice, the Court treats the terms "handicap" and "disability" interchangeably and uses "disability" in this opinion. *See Rodriguez*, 788 F.3d 31, 39 n.8 ("The FHA uses the term 'handicap' rather than 'disability.'  The FHA definition of 'handicap,' though, historically was virtually identical to the definition of 'disability' in the Americans with Disabilities Act of 1990 ("ADA"), and disability scholars tend to prefer the term 'disability.'").

[24] The Court's interpretation of the FHA is guided by cases construing the ADA prior to its amendment in 2008. *See Rodriguez*, 788 F.3d at 40 n. 10 ("Until 2008, the ADA definition of 'disability' was virtually identical to the FHA definition of 'handicap,' and so the Court's interpretation of the ADA was frequently applied to the FHA.  Congress amended the ADA, including its definition of 'disability,' in 2008.  The FHA, however, was not similarly amended and so our FHA interpretation is still guided by pre-ADAAA cases." (citations omitted)).

F.3d at 43 (quoting *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002),

*superseded by statute* Americans with Disabilities Act Amendments Act of 2008, § 4, Pub. L.

No. 110-325, 122 Stat. 3553, 3554 ("ADAAA")); *see also id.* at 45 ("[I]t is the impact of [the]

impairment, not its most severe physical manifestations, that must be 'permanent or long

term.'"). Moreover, whether a major life activity is substantially limited requires "[a]n

individualized assessment," *id.* at 43 (quoting *Toyota*, 534 U.S. at 199), and "must be evaluated

'with reference to measures that mitigate the individual's impairment,'" *id.* (quoting *Sutton v.*

*United Air Lines, Inc.*, 527 U.S. 471, 475 (1999), *superseded by statute* ADAAA, § 4, 122 Stat.

at 3556). "Medical testimony may be helpful to show that an impairment is substantially

limiting, but it is not always necessary." *Id.* At summary judgment, "conclusory declarations

are insufficient to raise a question of material fact," but "non-medical evidence that conveys, in

detail, the substantially limiting nature of an impairment may be sufficient to survive summary

judgment." *Id.* at 44.

Mazzocchi contends that Doe suffers from bipolar disorder and that this mental

impairment substantially limits her concentration, thinking, and cognitive function, and her

ability to care for herself, interact with others, work, and sleep. As a threshold matter,

Mazzocchi offers no admissible medical evidence diagnosing Doe with bipolar disorder. The

Fieve report is inadmissible as discussed *supra*, and Mazzocchi's recollection that a doctor at

Bellevue Hospital told him that Doe had been diagnosed with bipolar disorder constitutes

inadmissible hearsay. Mazzocchi nonetheless urges the Court to conclude that Doe suffers from

bipolar disorder—or, at the very least, some mental impairment within the meaning of the

FHA—based on evidence that Doe was involuntarily confined at Bellevue Hospital and

prescribed medication approved by the U.S. Food and Drug Administration for the treatment of

34

bipolar disorder,[25] along with evidence that she exhibited conduct perceived by Mazzocchi and Building staff, residents, and Board members to be inappropriate, erratic, and delusional.[26] Although the Second Circuit has held that medical evidence is "not always necessary" to establish that an impairment substantially limits major life activities, *Rodriguez*, 788 F.3d at 43, it has not ruled on whether such evidence is necessary to establish the existence of an impairment in the first instance—much less a mental impairment of the type alleged here, *cf. id.* at 42 (finding a genuine dispute of fact as to whether minor suffered from an impairment on the basis of a sworn declaration from the minor's pediatrician and mother's testimony); *see also Grabin v. Marymount Manhattan Coll.*, No. 12 Civ. 3591, 2015 WL 4040823, at *11 (S.D.N.Y. July 2, 2015) (collecting cases).

The Court need not reach this issue, however. Even assuming that Doe is mentally impaired, the evidence does not establish a genuine dispute as to whether the alleged impairment "substantially limits" any of Doe's major life activities. First, Mazzocchi contends that Doe is substantially limited in thinking, concentrating, and cognitive function,[27] based on his observation of Doe's inability to perform basic arithmetic, write above a kindergarten level, write a check, use a computer, prepare a budget, make change, or remember what she reads. However, Mazzocchi's vague description of Doe's limitations—unsupported by specific

---

[25] Mazzocchi asks the Court to take judicial notice that Depakote and Risperdal—which, according to Mazzocchi's declaration, were prescribed to Doe following her hospitalization at Bellevue—are both FDA-approved for the treatment of symptoms of bipolar disorder. Because the Court does not rule on whether Mazzocchi has raised a genuine dispute as to whether Doe suffers from a mental impairment, the Court need not—and does not—take judicial notice of the relevant FDA labels.

[26] The Court declines to consider the statements made during the May 4, 2011 Board meeting in deciding whether Doe was "actually disabled" within the meaning of Section 3604(h)(1). Although those statements are admissible for the purpose of determining whether Doe was "regarded as" having a disability insofar as the statements bear on Defendants' state of mind, they are inadmissible for the truth of the matters asserted therein and thus need not be considered in analyzing whether Doe is "actually disabled." *See Raskin,* 125 F.3d at 66.

[27] The Court assumes *arguendo* that concentration, thinking, and cognitive function are major life activities under the FHA. *Cf.* 42 U.S.C. § 12102(2)(A) (defining major life activities under the ADAAA to include "concentrating, thinking [and] communicating").

35

examples and based entirely on his interpretation of Doe's mental state—do not provide a sufficient basis for a reasonable jury to conclude that the alleged mental impairment "prevent[s] or severely restrict[s]" or has a "permanent and long term" impact on Doe's ability to think and concentrate, *Rodriguez*, 788 F.3d at 43, or that Doe's limitations result from the alleged mental impairment rather than from, for example, a lack of education or training, *see, e.g., Felkins v. City of Lakewood*, 774 F.3d 647, 652-53 (10th Cir. 2014) ("[T]he failure of proof on which our [summary judgment] decision turns is that [plaintiff] has not provided proper evidence that any limitation she may have is *caused* by [her physical impairment]." (emphasis in original)).  Nor does the evidence of Doe's delusional beliefs, paranoia, and inappropriate conduct—as described by Mazzocchi and Building staff, residents and Board members—create a genuine dispute of material fact.  These isolated instances fail to show that the alleged impairment has a "permanent and long term" impact, *Rodriguez*, 788 F.3d at 43, and they fail to "convey[], in detail, the substantially limiting nature of [the] impairment." *Rodriguez*, 788 F.3d at 44.  As such, the evidence adduced by Mazzocchi fails to raise a genuine dispute of fact as to whether Doe's alleged impairment substantially limits her thinking, concentration, and cognitive function.

Second, Mazzocchi contends that Doe's mental impairment substantially limits her ability to care for herself.  Specifically, Mazzocchi states that Doe stopped dying or combing her hair, stopped wearing makeup or cleaning her fingernails, experienced significant weight gain, and began wearing inappropriately revealing clothing.  Pl. Decl. ¶ 34; Pl. Dep. 225; *see also* Moschella Dep. 54; Nagle Dep. 36-37.  Although failure to attend to personal hygiene can evince a substantial limitation on one's ability to care for themselves, *see Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 204 (2d Cir. 2004), the superficial changes in Doe's appearance described by Mazzocchi do not rise to the level of a "severe" restriction.  Moreover, Mazzocchi conceded in

36

his deposition that Doe is capable of performing "the mundane things that are necessary in life," *i.e.*, "[s]he's able to feed herself, she's able to go shopping, she takes care of the dog, she does the laundry, she functions." Pl. Dep. 220. Taken as a whole, this evidence does not raise a genuine dispute of fact as to whether Doe's alleged mental impairment "prevent[s] or severely restrict[s]" her ability to take care of herself. *Rodriguez*, 788 F.3d at 44.

Third, Mazzocchi argues that Doe's mental impairment substantially limits her ability to interact with others. To satisfy this standard in the Second Circuit, a plaintiff must show that the impairment "severely limits the fundamental ability to communicate with others," *i.e.*, "to initiate contact with other people and respond to them, or to go among other people—at the most basic level of these activities." *Jacques*, 386 F.3d at 203. "The standard is not satisfied by a plaintiff whose basic ability to communicate with others is not substantially limited but whose communication is inappropriate, ineffective, or unsuccessful." *Id.* The evidence shows that although Doe's interactions with others in the Building may be offensive or inappropriate, she is nonetheless able to "communicate with others . . . at the most basic level of these activities." *Id.* To the extent that Mazzocchi argues that Doe's inability to interact with others stems from isolation caused by the alleged impairment, *see Jacques*, 386 F.3d at 203-04 (noting that a plaintiff could establish a substantial limitation on her ability to interact with others "by demonstrating isolation resulting from any of a number of severe conditions, including acute or profound cases of: autism, agoraphobia, depression or other conditions"), Mazzocchi has not adduced sufficient evidence showing that any such isolation is permanent and long term. Mazzocchi describes instances during which Doe's paranoia or delusional beliefs have arguably affected her ability to interact rationally with others. However, to the extent that irrational interactions—as opposed to interactions that are "inappropriate, ineffective, or unsuccessful,"

*Jacques*, 386 F.3d at 203—may evidence a substantial limitation on one's ability to interact with others, Mazzocchi has not shown that the isolation that Doe has experienced is permanent and long term. Therefore, the Court concludes that Mazzocchi has not raised a genuine dispute of fact as to whether Doe's ability to interact with others is substantially limited.

Fourth, Mazzocchi contends that Doe is substantially limited in her ability to work, based in large part on Doe's hearsay statements to Mazzocchi shortly after she moved to New York, indicating that she had been fired from two previous jobs: one at a restaurant because she could not remember her customers' orders, and another at a hospice because she told the patients that they would get better. Even taking these hearsay statements into account, Mazzocchi fails to show that Doe's termination from these jobs was attributable to her alleged impairment. *See Felkins*, 774 F.3d at 652-53. Nor does the mere fact that Doe was terminated from two jobs show that Doe is "unable to work in a broad class of jobs," *Sutton*, 527 U.S. at 491, as required to demonstrate a substantial limitation. To support his contention that Doe is substantially limited in her ability to work, Mazzocchi also cites limitations on Doe's ability to interact with others and to think, concentrate, and function cognitively. However, those limitations are not substantial for the reasons discussed *supra*, and, even taken in conjunction with the hearsay evidence of Doe's employment history, do not raise a genuine dispute of material fact as to whether Doe is able to "work in a broad class of jobs," *id.*

Finally, Mazzocchi contends that Doe is substantially limited in her ability to sleep. Mazzocchi states in his declaration that Doe developed odd sleeping habits in 2007, had violent nightmares which prevented her from falling asleep, and began going for days without sleeping. Mazzocchi does not, however, provide any details regarding the frequency or severity of the insomnia, nor does he state whether Doe's sleeping problems continued beyond 2007.

Mazzocchi's statements constitute little more than "conclusory declarations . . . insufficient to raise a question of material fact," *Rodriguez*, 788 F.3d at 44, and fail to provide a basis for a reasonable jury to conclude that the limitation is "permanent and long term" or severely restricts Doe's ability to sleep.  As such, Mazzocchi has not raised a genuine dispute of fact as to whether Doe is substantially limited in her ability to sleep.

In conclusion, Mazzocchi has not raised a genuine dispute of material fact as to whether Doe's alleged mental impairment substantially limits any of her major life activities. Accordingly, Mazzocchi's FHA claims brought on the basis that Doe is "actually disabled" under Section 3604(h)(1) are DISMISSED.

### ii.   Record of Impairment

Under Section 3602(h)(2), a disability can be established "by 'a record' of an impairment that substantially limits one or more major life activities."  *Colwell v. Suffolk Cty. Police Dep't*, 158 F.3d 635, 645 (2d Cir. 1998).  This provision is satisfied "if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment."  *Id.* (discussing the EEOC regulations promulgated under the ADA).  Mazzocchi argues that Doe's hospitalization at Bellevue constitutes a record of impairment within the meaning of 3604(h), but offers no evidence that Defendants "relied on" any such record.  Nor does he demonstrate that the impairment for which Doe was hospitalized substantially limited Doe's major life activities. *See Quintero v. Rite Aid of New York, Inc.*, No. 09 Civ. 6084, 2011 WL 5529818, at *13 (S.D.N.Y. Nov. 10, 2011) ("Allowing the mere fact of Quintero's hospitalization to establish a disability—with no evidentiary showing of how, if at all, the impairment for which she was hospitalized imposed a substantial limitation, would recognize an impermissible, and wholly counterintuitive, exception to the ADA." (citation omitted)).  Accordingly, Mazzocchi's FHA

claims grounded on the theory that Doe has a record of impairment under Section 3604(h)(2) are DISMISSED.

      iii.   Regarded As Disabled

Under the "regarded as" test, disability under the FHA can be established by, *inter alia*, a showing that a person "[h]as a physical or mental impairment that does not substantially limit one or more major life activities but that is treated by another person as constituting such a limitation," *Rodriguez*, 788 F.3d at 49 (quoting 24 C.F.R. § 100.201(d)(1)), or a showing that the person does not have a mental or physical impairment "but is treated by another person as having such an impairment," 24 C.F.R. § 100.201(d)(3); *see also Sutton*, 527 U.S. at 489-90. In either situation, the plaintiff must show that "defendants perceived [the plaintiff's] impairment as substantially limiting the exercise of a major life activity." *See Rodriguez*, 788 F.3d at 49 (quoting *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 153 (2d Cir.1998)) (discussing 24 C.F.R. § 100.201(d)(1)). Whether a person is "regarded as" disabled "is a question embedded almost entirely in the [defendant's] subjective state of mind," *id.* at 49 (quoting *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001)), and "[the Second Circuit] has consistently held where subjective issues regarding a litigant's state of mind . . . are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable," *id.* (quoting *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984)).

Mazzocchi argues that Doe satisfies the "regarded as" test because Doe was regarded by Defendants as having a mental impairment that substantially limited her ability to obtain shelter. The Second Circuit has recognized that the ability to obtain shelter is "among the most basic of human needs and thus is a 'major life activity' for the purposes of the FHA." *Id.* at 49-50. To show that a person is regarded as having an impairment that substantially limits his or her ability

to obtain shelter, a plaintiff must establish that the person "is regarded as unable to live in a broad class of housing that would otherwise be accessible to her." *Id.* at 50. It is not enough to show that the person is "regarded as unable to[] live in a particular dwelling." *Id.*

Applying these standards and drawing all inferences in favor of Mazzocchi as required at summary judgment, the Court concludes that Mazzocchi has raised a genuine dispute of fact as to whether Defendants regarded Doe as having a mental impairment that substantially limited her ability to obtain shelter. At the May 4, 2011 meeting, participants gave detailed accounts of what they perceived to be Doe's inappropriate, erratic, and delusional behavior. As discussed *supra*, participants recounted instances when Doe cursed at and verbally threatened other Building residents without provocation; saw imaginary things and "talk[ed] to some kind of a creature in her mind"; and danced in front of the Building in the presence of children while wearing tight, revealing clothing. Beceriklisoy and Sullivan expressly attributed Doe's conduct to mental illness and expressed concern that Doe's behavior was a threat to the Building's image and market value. Board members also heard Cruz repeatedly describe Doe as "crazy" and were told by Moschella that Mazzocchi had informed him on one occasion that Doe was acting "not right" because she was not taking her medication. Right after hearing these statements, Gilbert summarized the meeting participants' accounts of Doe's conduct and stated that "[Doe's] behavior has deteriorated." May 4 Tr. 94. The Board then voted to terminate Doe's lease "[o]n the grounds of undesirable and illegal tenancy." *Id.* 95. On this record, a reasonable jury could find that (1) the Board members concluded at the May 4, 2011 meeting that Doe had a mental impairment that caused her to engage in conduct that threatened the Building's image and market value and (2) acted on that belief when the Board voted to terminate the lease on the ground of undesirable and illegal tenancy. *See MHANY Mgmt.*, 819 F.3d at 609 ("[R]acially charged code

41

words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications.").

The likelihood that the Board concluded that Doe was suffering from a mental illness that threatened the Building's image and market value is heightened by the arguably pretextual justifications offered in the affidavits submitted by each Board member to explain their reasons for terminating Mazzocchi's lease. *See Ross*, 237 F.3d at 708 (noting that because "[plaintiff's] prima facie showing that he is disabled turns upon the [defendant's] state of mind," "evidence of the [defendant's] state of mind that would ordinarily be used to prove motive discriminatory intent may also be probative of [plaintiff's] status as a person with a disability," including pretext evidence). In her affidavit, Gilbert states that "mental disability/handicap played no role whatsoever in the decisions by the Board, nor by a single defendant, since none of [the Board members] had any awareness that Ms. Doe was disabled/handicapped." Gilbert Aff. ¶ 23. A reasonable jury could find it implausible that the Board members had "no awareness" that Doe might be suffering from mental illness at the time they voted to terminate Mazzocchi's lease, given the inappropriate, erratic, and delusional behavior described by meeting participants; Beceriklisoy and Sullivan's detailed accounts linking Doe's conduct to mental illness; and Board members' personal observations of Doe's behavior as recounted in their affidavits, including instances when they observed Doe screaming and threatening others in the Building and engaging in what Matten believed to be "sex acts" with her dog. In addition, given the utter absence of evidence suggesting that Doe abused alcohol or drugs, a reasonable jury could doubt the truthfulness of Dunphy, Gilbert, and Taylor's claimed belief that Doe was an alcoholic or a drug addict.[28] Moreover, each Board member stated in his or her affidavit that he or she voted to

---

[28] Notably, Section 3602(h) excludes from the definition of disability under the FHA "current, illegal use of or addiction to a controlled substance." 42 U.S.C. § 3602(h).

terminate Mazzocchi's lease due to Mazzocchi's lease violations and "out of a legitimate

concern to protect others and their property from the dangerous and harmful actions of Jane

Doe." Gilbert Aff. ¶ 24; *accord.* Matten Aff. ¶¶ 7, 13; Barsotti Aff. ¶ 6; Taylor Aff. ¶ 11;

Dunphy Aff. ¶ 10. A reasonable jury could find that although the evidence shows that Doe often

behaved inappropriately or even aggressively, her behavior did not rise to the level of

"dangerous and harmful," and that Defendants' perception of Doe's conduct was clouded by

stereotypes about those suffering from mental illness. *See Rodriguez*, 788 F.3d at 50

(emphasizing that the amendments to the FHA expanding coverage to disabled individuals "were

specifically aimed at rejecting '[g]eneralized perceptions about disabilities and unfounded

speculations about threats to safety . . . as grounds to justify exclusion.'" *Id.* at 50-51 (quoting

H.R. Rep. No. 100–711, at 18 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2179)).

In sum, based on the record evidence, a reasonable jury could find that Defendants did

conclude that Doe had a mental impairment that caused her to engage in conduct that threatened

the Building's image and market value. A reasonable jury could also find that Defendants'

conclusion reflected not only a belief that Doe was unfit to live in the Building, but also that her

mental illness caused her to engage in conduct that would make her unfit to live in a broad class

of housing. *See Rodriguez*, 788 F.3d at 49 (finding a genuine dispute of fact as to a substantial

limitation on ability to obtain shelter where evidence supported a finding that defendants

considered plaintiff "an undesirable tenant, restricted in her ability to obtain housing because

property owners would not wish to rent to her"). Defendants correctly note that Mazzocchi has

not offered evidence that Board members expressly stated that Doe's mental illness rendered her

unfit to obtain shelter. *Cf. id.* at 50 (focusing on three text messages sent by defendant, a real

estate agent, in analyzing whether plaintiff was regarded as substantially limited in her ability to

obtain housing).  However, the fact that evidence may be circumstantial does not preclude the

finding of a genuine dispute of material fact.  *Cf. MHANY Mgmt.*, 819 F.3d at 610 ("A victim of

discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually

constrained to rely on the cumulative weight of circumstantial evidence." (quoting *Rosen v.*

*Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991))).  Moreover, as the Second Circuit stated in

*Rodriguez*, whether a plaintiff is regarded as substantially limited in her ability to obtain shelter

"is a question embedded almost entirely in the [defendant's] subjective state of mind," and

"where subjective issues regarding a litigant's state of mind . . . are squarely implicated,

summary judgment would appear to be inappropriate and a trial indispensable."  *Rodriguez*, 788

F.3d at 49.  Considering the evidence as a whole, the Court concludes that Mazzocchi has raised

a genuine dispute of fact as to whether Defendants regarded Doe as having a mental impairment

that substantially limited her ability to obtain shelter.  *Cf. Ross*, 237 F.3d at 709 ("[W]here there

is substantial evidence that an individual's medical status played a significant role in an

employer's decision to fire that individual, combined with evidence that the employer concocted

a pretextual justification for that firing, the need for more extensive factual inquiry into whether

the employer engaged in unlawful discrimination is especially acute.").

     B.  Disparate Treatment Claims Under the FHA

     Disparate treatment claims under the FHA are analyzed under the burden-shifting

framework established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).  *See, e.g.*,

*Rodriguez*, 788 F.3d at 40 n.11.  To establish a prima facie case of discrimination under Section

3604(f)(2) of the FHA, a plaintiff must show that: (1) he is a member of a protected class; (2)

that the defendant took adverse action against him; and (3) that the adverse action took place

under circumstances giving rise to an inference of discrimination.  *Petrillo v. Schultz Props.*,

44

*Inc.*, No. 11 Civ. 6483, 2011 WL 4899963, at *2 (W.D.N.Y. Oct. 13, 2011); *see also Rodriguez*,

788 F.3d at 40 n.11.  If a prima facie case is established, the defendant must come forward with a

legitimate, nondiscriminatory reason for the adverse action.  *Rodriguez*, 788 F.3d at 40 n.11;

*MHANY Mgmt.*, 819 F.3d at 612.  If the defendant meets this "minimal burden of production,

'the sole remaining issue is discrimination *vel non*," and plaintiff "must prove that the defendants

intentionally discriminated against them on a prohibited ground."  *MHANY Mgmt.*, 819 F.3d at

613; *accord. Rodriguez*, 788 F.3d at 40 n.11.  Where the evidence supports a conclusion that

both permissible and impermissible factors motivated the adverse action, the mixed-motives

analysis set out in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) applies.  *MHANY Mgmt.*,

819 F.3d at 613.  Under the mixed-motives analysis, a plaintiff need not prove that

"discrimination was the 'but-for' cause of the . . . decision."  *MHANY Mgmt.*, 819 F.3d at 615-

16.  Rather, the plaintiff meets his or her burden of proof by "showing 'that the adverse action

was motivated, at least in part, by an impermissible reason.'"  *MHANY Mgmt.*, 819 F.3d at 613

(quoting *Cabrera*, 24 F.3d at 383); *accord. Tsombinidis v. West Haven Fire Dept.*, 352 F.3d 565,

579 (2d Cir. 2003).  If the plaintiff "has sustained this burden, then the defendant can prevail if it

sustains its burden of proving its affirmative defense that it would have taken the adverse action

on the basis of . . . permissible reason[s] alone."  *MHANY Mgmt.*, 819 F.3d at 613 (quoting

*Cabrera*, 24 F.3d at 383).

i.  Tudor

Defendants argue that Mazzocchi's claims against Tudor must be dismissed because

Mazzocchi fails to establish that Tudor took discriminatory adverse action against Doe and

Mazzocchi.  The Court agrees.  There is no evidence that Tudor was authorized to make

decisions regarding the termination of Mazzocchi's lease or the commencement of the ejectment

proceeding.  Moreover, assuming that Tudor's actions leading up to and including the May 4,

2011 hearing—including, *inter alia*, the written notifications sent to Mazzocchi regarding Doe's

conduct and statements made by Tudor employees at the May 4, 2011 meeting—could be

considered adverse action, Mazzocchi has not raised a genuine dispute that these actions took

place under circumstances giving rise to an inference of discrimination.  Accordingly,

Mazzocchi's claims against Tudor are DISMISSED.

> ii.  Windsor

For substantially the same reasons that the Court finds that Mazzocchi has raised a

genuine dispute of fact as to whether Defendants regarded Doe as having an impairment that

substantially limited her ability to obtain shelter, the Court concludes that Mazzocchi has raised a

genuine dispute of fact as to whether the Board took adverse action against Mazzocchi that was

motivated at least in part by Doe's perceived disability.  As discussed *supra*, Mazzocchi has

adduced evidence that (1) at the May 4, 2011 meeting, the Board heard detailed accounts from

Building staff, residents, commercial tenants, and Board members who described Doe's

inappropriate, erratic, and delusional behavior, attributed Doe's conduct to mental illness, and

voiced concerns that her conduct could negatively impact the Building's image and market

value; (2) the Board members voted to terminate Mazzocchi's lease right after hearing these

accounts, with one Board member stating that the accounts reflected that "[Doe's] behavior has

deteriorated"; and (3) the justifications offered by each Board member to explain their reasons

for terminating Mazzocchi's lease were arguably pretextual.  Based on this evidence, a

reasonable jury could find that the Board voted to terminate Mazzocchi's lease due, at least in

part, to their conclusion that Doe had a mental disability that caused her to engage in conduct

that compromised the Building's image and market value.  Such evidence would be more than

sufficient for a reasonable jury to conclude that Mazzocchi has established a prima facie case of discrimination under Section 3604(f)(2). And, assuming that Defendants have met their minimal burden of production to come forward with a legitimate, nondiscriminatory reason for terminating Mazzocchi's lease, the evidence would also be sufficient for a reasonable jury to conclude that Mazzocchi has met his burden to show discrimination *vel non*—that is, that the Board was motivated at least in part by Doe's disability when deciding to terminate Mazzocchi's lease.

Defendants argue that Mazzocchi's claims under Section 3604(f) cannot proceed to trial because (1) Section 3604(f)(2) does not require that housing be made available to individuals "whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others," 42 U.S.C. § 3604(f)(9), and (2) the Board would have terminated Mazzocchi's lease on permissible reasons alone—that is, Mazzocchi's lease violations and the threat that Doe's "dangerous" and "harmful" conduct posed to the safety of Building occupants and their property. Both of these claims turn on disputed issues of fact—*i.e.*, whether Doe's conduct constituted a direct threat to the health and safety of Building occupants and their property—that cannot be resolved at summary judgment. As discussed *supra*, a reasonable jury could find that although the evidence shows that Doe often behaved inappropriately or even aggressively, her behavior did not rise to the level of "dangerous and harmful," and that Defendants' perception of Doe's conduct was clouded by stereotypes about the mentally ill. *See Rodriguez*, 788 F.3d at 50 (emphasizing that the amendments to the FHA expanding coverage to disabled individuals ""were specifically aimed at rejecting '[g]eneralized perceptions about disabilities and unfounded speculations about threats to safety . . . as grounds to justify exclusion." *Id.* at 50-51 (quoting H.R. Rep. No. 100–

711, at 18 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2179)).

Accordingly, the motion for summary judgment on Mazzocchi's claims under Section 3604(f) of the FHA as to Windsor, Barsotti, Dunphy, Gilbert, Matten, and Taylor is DENIED.

VI.    Conspiracy Under 42 U.S.C. § 1985(3)

Section 1985(3) creates a cause of action against those who conspire "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws." 42 U.S.C. § 1985(3). To prove a violation of Section 1985(3), a plaintiff must show the existence of "(1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). The conspiracy "need not be shown by proof of an explicit agreement but can be established by showing the 'parties have a tacit understanding to carry out the prohibited conduct.'" *Id.* Further, it must be motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Id.*

Assuming that an FHA violation can form the basis for a Section 1985(3) cause of action, *cf. Sheikh v. Rabin*, No. 11 Civ. 425, 2012 WL 5471085, at *8 (N.D. Ill. Nov. 9, 2012) ("[T]he FHA does not give rise to a cause of action under § 1985(3)."), Mazzocchi's claim cannot proceed to trial because he does not raise a genuine dispute of material fact as to his 1985(3) claim. Mazzocchi attempts to establish a conspiracy by citing evidence that: (1) Hernandez received holiday bonuses that were "larger than normal" in 2008 and 2012, Hernandez Dep. 18-25 (explaining that the bonuses were due to Hernandez's long hours in 2008 and his receipt of a

competing offer in 2012); (2) Moschella and Hernandez assisted Windsor's attorney in identifying and preparing Building occupants to speak to Doe's conduct at the May 4, 2011 Board meeting, *see* Pl. Corrected Opp'n Br. 51-53, ECF No. 181-1; and (3) Windsor's attorney had previously advised the Board on "disruptive tenant issues," January 20, 2005 Board Minutes, Ostrove Decl., Ex. 27.  Such evidence does not raise a genuine dispute of fact as to the existence of a conspiracy, much less one with the purpose of depriving Mazzocchi of the equal protection of the laws.  Accordingly, Mazzocchi's claim under 42 U.S.C. § 1985(3) is DISMISSED.

**CONCLUSION**

For the foregoing reasons, the motion to strike is GRANTED, and the motion for summary judgment is GRANTED in part and DENIED in part.  The Clerk of Court is directed to terminate the motions at ECF Nos. 140 and 153.

SO ORDERED.

Dated: August 31, 2016
New York, New York

_____
ANALISA TORRES
United States District Judge

49